**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLIAM JOHN MCBRIDE, JR.,<br>Plaintiff. | )<br>)<br>) |
| v. | )<br>)<br>) |
| FINANCIAL INDUSTRY<br>REGULATORY AUTHORITY, INC.,<br>Defendant. | )<br>)<br>)<br>) |

Civil Action No. _____

## COMPLAINT
### (Action for Equitable Relief, Declaratory Judgment, and Permanent Injunction)

### INTRODUCTION

Plaintiff, William John McBride, Jr. ("Mr./Mrs. McBride"), by and through the undersigned counsel, hereby submits this Complaint seeking an equitable and declaratory judgment that information related to the customer disputes filed on: (1) January 6, 2006 as Occurrence No. 1291151; (2) January 14, 2016 as Occurrence No. 1865255; (3) January 19, 2016 as Occurrence No. 1865256; (4) August 25, 2016 as Occurrence No. 1900529; and (5) April 20, 2017 as Occurrence No. 1932445 (collectively, the "Occurrences") should be expunged from his IARD[1], IAPD[2], CRD[3], and BrokerCheck[4] records (together, his "Registration Records"), and seeking a permanent injunction against Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA") (also, "Defendant"), from publishing any further references to the Occurrences on Mr. McBride's Registration Records.

---

[1] The IARD, or Investment Adviser Registration Depository is an electronic filing system for Investment Advisers sponsored by the U.S. Securities and Exchange Commission (the "SEC"), with FINRA serving as the developer and operator of the system.
[2] The IAPD, or Investment Adviser Public Disclosure, is a public website sponsored by the SEC, which provides information about investment adviser firms and representatives, as well as links to BrokerCheck information.
[3] The CRD, or the Central Registration Depository is a FINRA owned and operated filing system that maintains registration information for broker-dealers and their representatives.
[4] BrokerCheck is a FINRA owned and operated website that contains certain information from the CRD that is available to the public without request.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over the present action as Section 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") grants the federal district courts "exclusive jurisdiction" over "all suits in equity and actions at law brought to enforce any liability or duty created by the Exchange Act or the rules and regulations thereunder." 15 U.S.C § 78aa(a).

2.      The Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1), D.C. CODE ANN. §§ 13-422 and 13-423 because FINRA maintains its principal place of business in the District of Columbia, and because the allegations and claims for relief herein arise from Defendant's transaction of business in the District of Columbia.

3.      As a result of Defendant's purposeful, substantial, and ongoing business activities in the District of Columbia, Defendant has established minimum contacts with the District of Columbia such that it is reasonable for Defendant to reasonably anticipate being subject to action in the courts of the District of Columbia.

4.      Venue is proper in this Court pursuant to 28 U.S. § 1391(b) as Defendant is located in the District of Columbia and this action relates to Defendant's activities within the District of Columbia.

## PARTIES

5.      PLAINTIFF, Mr. McBride (CRD No. 3124160) is a resident of Playa Del Rey, California. Mr. McBride has been in the financial services industry since September of 1998. (CRD) Mr. McBride is currently a registered representative with Western International Securities, Inc. ("Western International") in West Hollywood, California.

6.      DEFENDANT, FINRA, is a private corporation that acts as a self-regulatory organization ("SRO"). Defendant is a quasi-governmental organization that regulates its member

brokerage firms and exchange markets, as well as financial advisors. Part of Defendant's duties as an SRO include maintaining the CRD, which is a central licensing and registration system used by the securities industry. FINRA also maintains and operates BrokerCheck, a publicly accessible online database that contains information generated from the CRD. FINRA is monitored and regulated by the United States Securities and Exchange Commission (the "SEC"). FINRA is organized and existing under the laws of the state of Delaware but maintains its principal place of business in the District of Columbia.

## SUMMARY OF THE CLAIMS

7.      Mr. McBride brings this action for equitable relief in the form of expungement of the Occurrences from his Registration Records pursuant to this Court's inherent equitable power and/or pursuant to FINRA rules.

8.      Mr. McBride also brings this action, pursuant to 28 U.S.C. §2201, to seek a declaratory judgement that the Occurrences should be expunged pursuant to FINRA Rule 8312 and/or this Court's inherent equitable power.

9.      Mr. McBride also brings this action for equitable relief in the form of a permanent injunction against Defendant to permanently enjoin Defendant from publishing the Occurrences on Mr. McBride's Registration Records.

## GENERAL ALLEGATIONS

12.      FINRA was formerly known as the National Association of Securities Dealers ("NASD"). In 2007, the NASD changed its name to FINRA.

13.      Pursuant to authority delegated by the SEC, FINRA promulgates and enforces rules that govern the activities of all registered broker-dealer firms and registered representatives of those firms in the United States.

14.     Both broker-dealers and their registered representatives must register with FINRA in order to engage in the recommendation and sale of securities. Without the ability to conduct securities transactions, many registered representatives and broker-dealers could not do business.

15.     FINRA is the exclusive regulatory authority for registered representatives and broker-dealers who conduct the type of securities transactions within FINRA's purview.

16.     Once registered, either with FINRA the SEC, or a state securities division, registered representatives, investment advisers, investment adviser firms, and broker-dealers are assigned a number used to identify them on the CRD, the central licensing and registrations system used by the U.S. securities industry and its regulators. This number is called the "CRD number."

17.     Under FINRA Rule 4530, FINRA requires registered broker-dealers and registered representatives to disclose certain consumer-initiated disputes, termination events, and other occurrences within thirty (30) days of notification.[5]

18.     FINRA will then publish the disclosure on the registered representative's CRD record as an "Occurrence."

19.     FINRA publishes these disclosures regardless of merit. Indeed, FINRA does not investigate the merits of these disclosures prior to publication.

20.     The SEC monitors the securities industry. As part of its duties, the SEC sponsors the IARD, which is an electronic filing system that collects and maintains the registration reporting and disclosure information for registered investment advisors ("RIAs") and their associated persons. The SEC has tasked FINRA with the maintenance and operation of both the CRD and IARD systems.

---

[5] For Rule 4530, see https://www.finra.org/rules-guidance/rulebooks/finra-rules/4530.

21.     The IARD and CRD systems are operated and maintained by FINRA. FINRA is the registered copyright owner of both systems.

22.     FINRA and the SEC claim that the IARD and CRD systems have three objectives: (1) to create a regulatory system for investment advisors to improve overall regulation of advisors, (2) to make information about investment advisors available to the public, and (3) to provide investment advisors an efficient automated filing system.

23.     In 1996, Congress required that the SEC establish a readily accessible electronic process to respond to public inquiries about investment advisors and their disciplinary information. Therefore, the SEC created the IAPD website.

24.     The IAPD website is a publicly-accessible version of the IARD that publishes reports for SEC-registered and state-registered RIAs and IARs.

25.     Listed on an IAR's IAPD report are certain "disclosures," such as information on their regulatory and disciplinary history, certain criminal convictions, customer dispute allegations, and other information.

26.     All disclosures are highlighted in a big, bold, red box on the front of the IAR's IAPD page. A click on the big red "disclosure" box will bring the viewer immediately to the part of the IAPD report that further describes the disclosure.

27.     Information published to the CRD is also published to the IARD if an individual is dually registered with FINRA and the SEC or a state securities division. If an individual is registered with the SEC or a state only, but then later registers with FINRA, information on the IARD will feed to the CRD, and vice versa.

28.     FINRA also maintains and operates BrokerCheck (an almost identical website to the IAPD), a publicly accessible online database that contains information generated from the CRD.

29.     Once FINRA-registered, a BrokerCheck profile is created for a registered representative, which contains all disclosure information in one place.

30.     The BrokerCheck website also contains an easily-accessible link to an IAR's IAPD report regardless of whether that IAR is or ever was registered with FINRA.

31.     Since BrokerCheck and the IAPD were created, FINRA[6] has made a series of changes to the quantity and permanence of information available to the public on these websites.

32.     Initially, the public could only request these reports via written inquiry only.

33.     Now, these websites publish this information publicly, 24 hours a day, 7 days a week, without request.

34.     Unless expunged, disclosures and related settlements and arbitration awards are published on an individual's Registration Records permanently.

35.     There is also no restriction on access to IAPD or BrokerCheck reports, which means that disclosures impact not just a financial advisors' professional reputation, but their personal reputation, as well.

36.     Neither the SEC, state securities authorities, nor FINRA investigate or approve the information published on the Registration Records, and they acknowledge that it may not be accurate.[7]

---

[6] FINRA was created in July of 2007 through the consolidation of the NASD and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange ("NYSE"). For purposes of simplicity, throughout this Complaint, the NASD, NYSE and/or FINRA will simply be referred to as "FINRA".

[7] *See* https://adviserinfo.sec.gov/ and click "Learn More About IAPD."

37.    FINRA Rule 8312(g) states that FINRA shall not release certain information, which includes, "offensive or potentially defamatory language or information that raises significant identity theft, personal safety or privacy concerns that are not outweighed by investor protection concerns."[8]

38.    FINRA Notice to Members 99-54 ("Notice 99-54") states that "ordering expungement of information from the CRD system that is found to be defamatory, misleading, inaccurate, or erroneous, is equitable in nature." The Notice also states that arbitrators are not required to state explicitly in the award that all of the elements required to satisfy a claim in defamation under governing law have been met.[9]

39.    FINRA's Dispute Resolution Guide for Arbitrators (the "Arbitrator's Guide") states that when information is "defamatory in nature," it serves to portray "the broker in a negative light."

40.    In order to ensure the reliability of the information contained within these reports, the SEC and FINRA established a right pursuant to FINRA Rule 2080[10] or 8312 to seek expungement of disclosures published on the Registration Records systems.[11]

41.    FINRA Rule 2080(a) requires that Members or Associated Persons obtain a court order "directing … expungement or confirming an arbitration award containing expungement relief." Pursuant to FINRA rules, expungement is appropriate when:

    (a) the claim, allegation or information is factually impossible or clearly erroneous; (b) the registered person was not involved in the alleged investment-related sales practice

---

[8] For the full text of FINRA Rule 8312, *see* https://www.finra.org/rules-guidance/rulebooks/finra-rules/8312.
[9] For the full text of Notice to members 99-54, *see* https://www.finra.org/rules-guidance/notices/99-54.
[10] For the full text of FINRA Rule 2080, *see* https://www.finra.org/rules-guidance/rulebooks/finra-rules/2080.
[11] This right to seek expungement was approved by the SEC, as any codified FINRA rule is.

violation, forgery, theft, misappropriation, or conversion of funds; or (c) the claim, allegation or information is false.

FINRA Rule 2080(b)(1).

42.     FINRA does not require a court order to expunge information found to be "defamatory in nature" if expungement is recommended by an arbitrator on those specific grounds. Absent an arbitration award recommending expungement on the grounds that the information is "defamatory in nature" or "potentially defamatory," FINRA will require a court order to expunge the information. *See*, Notice 99-54.

43.     FINRA does not have exclusive jurisdiction to determine expungement of disclosures from the Registration Records systems.

44.     FINRA Rule 2080(a) states that "Members or associated persons seeking to expunge information from the CRD system…must obtain *an order from a court of competent jurisdiction directing such expungement* or confirming an arbitration award containing expungement relief." (emphasis added).

45.     FINRA has also stated recently that "[a] broker can seek expungement of customer dispute information by going through the FINRA arbitration process or directly to court." Release No. 34-88251; File No. SR-FINRA-2020-005, Federal Register, Vol. 85, No. 38 at p. 2 at II(1)(a), (Feb. 26, 2020).

46.     A financial services professional's CRD and IARD records are available in their entirety without subpoena to state securities regulators and other law enforcement agencies.

47.     The information is also available to securities firms, which are required to review a financial services professional's Registration Records when making hiring and supervisory decisions.

48.    FINRA will not expunge information from the Registration Records databases absent an arbitration award or court order.

49.    Broker-dealers and RIA firms do not have authority to expunge information from the Registration Records databases.

50.    This Court is not bound by FINRA rules but may consider them at its discretion.

## SPECIFIC ALLEGATIONS

51.    The foregoing allegations are incorporated as if fully set forth herein.

52.    Mr. McBride is a resident of Playa Del Rey, California. He has been a financial services professional since September of 1998. Mr. McBride currently has a CRD record and public BrokerCheck record through his FINRA registration. Mr. McBride also has an IARD record and public IAPD record through his SEC registration.

53.    Since September of 2018, Mr. McBride has been registered with Western International. Mr. McBride was previously registered with other FINRA and SEC registered investment adviser and broker-dealer firms, including UBS Financial Services Inc. (f/k/a PaineWebber Incorporated) (CRD No. 8174), Cal Fed Investments (CRD No. 19631), Citicorp Investment Services (CRD No. 23988), WaMu Investments Inc. (CRD No. 599) ("WaMu"), Chase Investment Services Corp. (CRD No. 25574) ("Chase"), and JP Morgan Securities LLC (CRD No. 79) ("JPM").

## Occurrence Number 1291151

54.    In 2005, Mr. R. T.[12] ("Mr. T") became a client of Mr. McBride with WaMu, through a banking referral. Mr. T had approximately $200,000 that he wanted to invest in a tax-efficient manner.

---

[12] For privacy reasons, the client names have been omitted throughout. FINRA is aware of the clients' identities.

55.    Mr. T was approximately in his 50s and was a real estate investor. He had limited investment experience. Based on Mr. T's conversations with Mr. McBride, as well as personal and financial information forms completed by Mr. T, Mr. McBride and Mr. T ascertained Mr. T's investment objective to be tax-free growth with a moderate risk tolerance. Mr. T had no liquidity needs, and his investment time horizon was more than five years.

56.    Mr. T opened a brokerage account with WaMu, and he completed and signed all necessary account-opening documents and disclosures.

57.    Based on Mr. T's investor profile and investment objectives, Mr. McBride recommended a variety of diverse investments as part of a balanced, diversified portfolio, including certain municipal bonds (collectively, the "T Bonds").

58.    Mr. McBride explained to Mr. T in detail the terms, risks, costs, fees, advantages, and disadvantages of the T Bonds. Mr. McBride and Mr. T discussed tax-equivalent yield, opportunity cost, and time horizon, in connection with the purchase of the T Bonds.

59.    Because Mr. T was a real estate investor, Mr. McBride recommended not purchasing the T Bonds, if Mr. T planned to use those funds within the next two years for real estate purchases. Mr. T agreed that he would not need those funds for real estate purchases within the next two years.

60.    In approximately mid-2005, Mr. T purchased the T Bonds for $200,000.

61.    Between 2005 and January of 2006, Mr. McBride spoke with Mr. T regularly regarding the performance of Mr. T's portfolio. Mr. T received interest payments from the T Bonds.

62.     Approximately six months after purchasing the T Bonds, Mr. T found a property that he wanted to purchase, and he needed the funds invested in the T Bonds to complete the purchase.

63.     In or around early 2006, Mr. T liquidated the T Bonds for a loss of approximately one percent.

64.     Mr. T did not speak with Mr. McBride about lodging a formal complaint.

65.     On January 6, 2006, a customer dispute by Mr. T was reported to Mr. McBride's Registration Records, alleging that the "client feels financial consultant misrepresented products at time of purchased, products were not in line with investment objectives."

66.     Mr. T sought compensatory damages in the amount of $7,734.70.

67.     This customer dispute is referenced in the CRD as occurrence number 1291151.

68.     On March 1, 2006, after completing a thorough investigation, WaMu denied the claim.

69.     Mr. T did not pursue his claim in arbitration or court.

### Occurrence Number 1865255

70.     In or around January of 2015, Mr. A. G. ("Mr. G") became a client of Mr. McBride with JPM, through a banking referral. Mr. G wanted to invest for future income.

71.     Mr. G was 72 years of age, retired, and very physically fit for his age. He had moderate investment experience. Based on Mr. G's conversations with Mr. McBride, as well as personal and financial information forms completed by Mr. G, Mr. McBride and Mr. G ascertained Mr. G's investment objective to be growth and income. Mr. G had no liquidity needs, and his investment time horizon was more than five years.

72.    Mr. G opened a brokerage account with JPM, and he completed and signed all necessary account-opening documents and disclosures.

73.    Based on Mr. G's investor profile and investment objectives, Mr. McBride recommended a variety of diverse investments as part of a balanced, diversified portfolio. The recommendations included a variable annuity with a lifetime income rider (the "G Annuity").

74.    Mr. McBride explained to Mr. G in detail the terms, risks, costs, fees, features, and benefits of the G Annuity. Mr. G received and reviewed the prospectus associated with the G Annuity, which further explained its terms, risks, costs, fees, features, and benefits.

75.    On or around January 15, 2015, Mr. G purchased the G Annuity. He completed and signed disclosure documents, wherein he affirmed his understanding of the terms, risks, costs, fees, features, and benefits of the G Annuity. He received copies of the signed documents.

76.    Between approximately January of 2015 and January of 2016, Mr. McBride spoke with Mr. G frequently regarding the performance of Mr. G's portfolio. Mr. G frequently visited Mr. McBride's offices.

77.    When Mr. G received the G Annuity contract, Mr. McBride and Mr. G reviewed the G Annuity contract.

78.    When Mr. G received his first annual statement for the G Annuity, he sent Mr. McBride an email (the "G Email"), requesting another review of the terms of the G Annuity. Mr. G specifically asked about the difference in the account value and the income base of the G Annuity.

79.    Mr. McBride called Mr. G, and they reviewed the terms of the G Annuity. Mr. McBride clarified for Mr. G the difference between the G Annuity's account value and its income

base. Mr. G expressed his satisfaction with the clarification and the general review of the G Annuity.

80.     Mr. G did not speak with Mr. McBride about lodging a formal complaint, and Mr. G did not lodge a formal complaint. However, JPM's compliance department ("Compliance") reported the G Email as a formal complaint.

81.     On January 14, 2016, a customer dispute by Mr. G was reported to Mr. McBride's Registration Records, alleging that the "Client alleges poor recommendation/poor advice regarding variable annuity investment. Activity dates 01/15/2015-01/15/2015."

82.     It was reported to Mr. McBride's Registration Records that Mr. G sought compensatory damages in the amount of $31,000.

83.     This customer dispute is referenced in the CRD as occurrence number 1865255.

84.     On February 3, 2016, after completing a thorough investigation, JPM denied the claim.

85.     Mr. G did not pursue his claim in arbitration or court.

## Occurrence Number 1865256

86.     In December of 2015, Mr. A. M. ("Mr. M") became a client of Mr. McBride with JPM, through a banking referral. Mr. M had approximately $50,000 that he wanted to invest for growth.

87.     Mr. M was approximately 30 years of age. Based on Mr. M's conversations with Mr. McBride, as well as personal and financial information forms completed by Mr. M, Mr. McBride and Mr. M ascertained Mr. M's investment objective to be growth with a high risk tolerance. Mr. M had no liquidity needs, and his investment time horizon was long-term.

88.    Mr. M opened a brokerage account with JPM and completed and signed all necessary documents and disclosures.

89.    Based on Mr. M's investor profile and investment objectives, Mr. McBride recommended a variety of mutual funds, including a certain Putnam mutual fund (the "Putnam Fund").

90.    Over the course of multiple meetings, Mr. McBride spoke with Mr. M for a total of approximately eight hours, explaining to Mr. M in detail the terms, risks, costs, fees, advantages, and disadvantages of all of his investment recommendations. The Putnam Fund was an A-share mutual fund with an upfront sales charge.

91.    In December of 2015, Mr. M purchased the Putnam Fund.

92.    Between December of 2015 and January of 2016, Mr. McBride spoke with Mr. M regularly regarding the performance of Mr. M's portfolio. The Putnam Fund comprised the entirety of Mr. M's portfolio.

93.    Within the first two weeks of owning the Putnam Fund, the investment declined in value. Mr. M told Mr. McBride that he was checking his account value on an hourly basis.

94.    On multiple occasions, Mr. M visited Mr. McBride's offices to discuss the Putnam Fund.

95.    Mr. M sent Mr. McBride an email (the "M Email"), asking for a clarification regarding the Putnam Fund and expressing his dissatisfaction with the performance of the Putnam Fund.

96.    Mr. M did not speak with Mr. McBride about lodging a formal complaint, and Mr. M did not file a formal complaint. JPM's compliance department reported the M Email as a formal complaint.

97.     On January 19, 2016, a customer dispute by Mr. M was reported to Mr. McBride's Registration Records, alleging that the "Client alleges poor recommendation/poor advice regarding mutual funds investment. Activity dates 12/24/2015-01/19/2016."

98.     It was reported to Mr. McBride's Registration Records that Mr. M sought compensatory damages in the amount of $7,000.

99.     This customer dispute is referenced in the CRD as occurrence number 1865256.

100.    On March 15, 2016, as a business decision, JPM settled with Mr. M in the amount of $3,203.20. The settlement was less than half of the amount sought and a nominal amount in light of the potential cost of arbitration or litigation. Mr. McBride did not contribute to the settlement amount, nor did he receive, review, or sign the settlement agreement.

101.    Mr. M did not pursue his claim in arbitration or court.

## Occurrence Number 1900529

102.    In December of 2013, Mr. S. L. M. ("Mr. SM") and his brother, Mr. P. M. ("Mr. PM") (together, the "SM Brothers"), visited Mr. McBride's branch of Respondent and spoke with a private client banker, Ms. Whitney Rollins. The SM Brothers wanted certain documents notarized. They were currently managing their mother's investment account belonging to their mother, Ms. R. M. ("Ms. SM"), who was approximately 92 years of age. The SM Brothers expressed displeasure with their current financial advisor with Union Bank.

103.    Between December of 2013 and approximately August of 2014, Mr. McBride met with the SM Brothers and Ms. SM (collectively, the "SM Family") on approximately ten occasions, in order to assist them with their financial issues.

104.    Ms. SM owned a brokerage account valued at approximately $2.1 million, with a transfer-on-death ("TOD") designation to the SM Brothers, as well as the D. & R. M. Trust account (the "SM Trust"), which was valued at approximately $2.4 million.

105.    The SM Brothers told Mr. McBride that their other brother, Mr. J. M. ("Mr. JM"), was financially abusing Ms. SM and that both of Ms. SM's accounts should eventually be transferred to them. The SM Brothers were currently suing Mr. JM.

106.    Mr. McBride reviewed the investments in Ms. SM's accounts. Ms. SM owned 450,000 shares of the University of California Revenue Bond (the "Revenue Bond"), which was a municipal bond. As of November 30, 2013, the Revenue Bond was valued at $492,727.50. The cost basis of the bond was $486,500, meaning that the bond had experienced an unrealized gain of $6,277. The Revenue Bond was paying interest of five percent and had a call date of May, 15, 2016. Ms. SM also owned an Invesco Ltd. ("Invesco") tax-free fund (the "Invesco Fund") that was currently providing a yield of 4.27%. As of November 30, 2013, the total unrealized gain of Ms. SM's four bond funds (collectively, the "SM Bonds") was $11,020.64.

107.    In or around January of 2014, Ms. SM transferred the SM Bonds and the Invesco Fund to Mr. SM.

108.    In or around January of 2014, Mr. SM became a client of Mr. McBride with JPM, through a banking referral. Mr. McBride's assistant, Ms. Aubrey Steele, verified with Mr. SM all of his holdings, income, and suitability information.

109.    Mr. SM was 52 years of age and unemployed. He had previously been an airplane mechanic and pilot. He had moderate investment experience. Mr. PM was an experienced investor. Mr. SM's annual income was approximately $100,000, his liquid net worth was more than $2 million, and his net worth was approximately $3 million. Based on Mr. SM's conversations with

Mr. McBride, as well as personal and financial information forms completed by Mr. SM, Mr. McBride and Mr. SM ascertained Mr. SM's investment objective to be growth and income with a moderate risk tolerance.

110.    Mr. SM hoped to find employment as a private pilot.

111.    In August of 2014, Mr. SM opened a brokerage account with JPM.

112.    Based on Mr. SM's investor profile and investment objectives, Mr. McBride recommended a variety of diverse investments as part of a balanced, diversified portfolio. The recommendations included: (a) the SunAmerica Polaris Retirement Protector variable annuity (the "SunAmerica Annuity") with a lifetime income rider (the "Rider"); and (b) a Nationwide Life Insurance Company ("Nationwide") annuity variable annuity (the "Nationwide Annuity") (together, the "SM Annuities"). Mr. McBride also recommended three of Respondent's mutual funds, including: (a) the Income Builder Class A mutual fund (the "Income Fund"); (b) the U.S. Equity A mutual fund (the "Equity Fund"); and (c) the Investors Growth Fund A mutual fund (the "Investors Fund") (collectively, the "SM Funds").

113.    Mr. McBride explained to Mr. SM in detail the terms, risks, costs, fees, features, and benefits of the SM Annuities. Mr. SM received and reviewed the prospectus associated with the SM Annuities, which further explained their terms, risks, costs, fees, features, and benefits.

114.    The SunAmerica Annuity provided the potential for market growth in a conservative portfolio, and the Rider provided guaranteed, lifetime income of between 5.5% and 6%. The SunAmerica Annuity provided an income base that would increase at a rate of six percent annually for 12 years, after which time, the income base would double. Mr. McBride explained that Mr. SM did not have to pay any taxes on the SunAmerica Annuity until he made a withdrawal. Mr. McBride explained the SunAmerica Annuity's five-year surrender schedule. Mr. McBride

explained that Mr. SM could take withdrawals of ten percent annually without any surrender charge. Additionally, in the event that Mr. SM needed liquidity, he could withdraw funds from one of the SM Annuities, while leaving the other one in place.

115.    Mr. McBride explained to Mr. SM in detail the terms, risks, costs, fees, advantages, and disadvantages of the SM Funds. The Income Fund currently provided a monthly dividend of approximately 4.5%. Mr. McBride explained that the SM Funds would provide Mr. SM with approximately $40,000 annually in additional income.

116.    In or around September of 2014, Mr. SM liquidated the SM Bonds, resulting in capital gains of approximately $11,020.64. Mr. SM also liquidated the Invesco Fund, resulting in proceeds totaling $2,536,199.92.

117.    In connection with the liquidation of the Invesco Fund and the SM Bonds, Mr. McBride charged Mr. SM a total transaction cost of $1,906.25, which was a significant discount over the suggested rate of $11,437.50. The Investors Fund contained approximately 30 mutual funds, representing virtually every asset class.

118.    On September 5, 2014, Mr. SM liquidated the Revenue Bond.

119.    The proposed purchase by Mr. SM of the SM Funds and the SM Annuities (collectively, the "Disputed Investments") was reviewed and sanctioned by Mr. McBride's supervisory manager, Mr. Jason Ellwein.

120.    On September 17, 2014, Mr. SM purchased the SM Annuities for $500,000 each. He completed and signed disclosure documents, wherein he affirmed his understanding of the terms, risks, costs, fees, features, and benefits of the SM Annuities. He received copies of the signed documents.

121.    The SunAmerica Annuity represented approximately 40% of Mr. SM's portfolio (the "SM Portfolio"). The Rider provided guaranteed, lifetime income of $120,000 annually, beginning at the age of 65. However, if the contract value of the SunAmerica Annuity were to reach zero, Mr. SM would receive four percent of the income base, or approximately $80,000. SunAmerica charged a fee of 2.65% for the Rider and the mortality and expense fee.

122.    Mr. SM purchased the Equity Fund for $400,000, the Investors Fund for $300,000, and the Income Fund for approximately $750,000.

123.    Between approximately September of 2014 and June of 2016, Mr. McBride spoke with Mr. SM regularly regarding the performance of the SM Portfolio, which was designed for growth, tax deferral, current income, and future income. The SM Portfolio contained more than $133,000 in cash for emergency liquidity needs.

124.    Between approximately September of 2014 and approximately September of 2015, Mr. SM had the dividends from the SM Portfolio transferred directly into his checking account.

125.    Mr. McBride assisted Mr. PM with a managed growth portfolio, with respect to Mr. PM's share of the inheritance. Mr. PM maintained liquidity of more than $500,000 in his account.

126.    The SM Brothers were both heavy drinkers of alcohol. Mr. SM had quite a serious drinking problem and was socially awkward. He had been unemployed and living with Ms. SM for nearly ten years. Ms. SM was using the interest from tax-free bonds that owned to support herself and Mr. SM. The SM Brothers wanted to ensure that Ms. SM was cared for, and that upon her passing, her house and assets would be passed on to them in an efficient manner.

127.    The SM Brothers told Mr. McBride that Mr. J. M. often encouraged Ms. SM to purchase expensive bottles of wine, which he then kept without opening.

128.    Mr. PM told Mr. McBride that Mr. SM was drinking as much as a bottle of whiskey per day and that Mr. SM was under tremendous stress, due to the many lawsuits in which the SM Brothers were involved.

129.    In September of 2015, Mr. SM liquidated $100,000 from the Income Fund, in order to pay his legal bills.

130.    On November 16, 2015, Mr. McBride met with Mr. SM, and they spoke with Mr. PM on a conference call. Mr. PM had convinced Mr. SM that Mr. SM should purchase individual equities, in order to generate more funds. Mr. McBride recommended maintaining Mr. SM's current portfolio, although he conceded that Mr. SM could purchase a few individual stocks, in order to maintain the interest in his portfolio. Mr. PM recommended shares of Amazon.com, Inc. and Starbucks Corporation (collectively, the "SM Stocks"). Mr. McBride recommended only purchasing $20,000 of each stock.

131.    On November 19, 2015, Mr. SM liquidated a small amount of the SM Funds, in order to purchase the SM Stocks, for $20,000 each. The liquidation of the two mutual funds resulted in net proceeds of $719,130.79 and a profit of $19,130.79. The liquidation of mutual funds resulted in a capital loss of $27,000. Mr. SM also invested another $200,000 into the Income Fund, in order to increase his monthly income.

132.    Based on Mr. SM's investor profile and investment objectives, Mr. McBride recommended the AXA Investment Edge variable annuity (the "AXA Annuity").

133.    Mr. McBride explained to Mr. SM in detail the terms, risks, costs, fees, features, and benefits of the AXA Annuity. Mr. SM received and reviewed the prospectus associated with the AXA Annuity, which further explained its terms, risks, costs, fees, features, and benefits. The AXA Annuity had no up-front charge and no surrender charge.

134.    Mr. SM purchased the AXA Annuity for approximately $480,000. He completed and signed disclosure documents, wherein he affirmed his understanding of the terms, risks, costs, fees, features, and benefits of the SM Annuities.

135.    On December 2, 2015, Mr. McBride and Mr. SM reviewed the purchase of the AXA Annuity and the Income Fund. Mr. SM was satisfied with his investments.

136.    The SM Brothers told Mr. McBride that they wanted to divide Ms. SM's trust (the "SM Trust") and put the proceeds in their own accounts. Mr. McBride asked for documents from Ms. SM's physician, affirming that she requested financial assistance, before Mr. McBride would assist the SM Brothers with their request to take over the SM Trust.

137.    Mr. McBride and his branch manager met with Ms. SM and confirmed that she was competent to continue making her own financial decisions. Ms. SM also had paperwork from her doctor, affirming the same.

138.    On June 1, 2016, at 3:30 a.m., Mr. SM left Mr. McBride a voicemail, when Mr. McBride did not answer the call on his cell phone. Mr. SM requested a withdrawal of $100,000 from the SM Portfolio, in order to pay for his legal fees.

139.    On June 2, 2016, Mr. McBride called Mr. SM and confirmed that Mr. SM needed a withdrawal of $100,000. Mr. SM was embarrassed that he had called Mr. McBride's personal cell phone in the middle of the night.

140.    Upon information and belief, the SM Brothers met with their attorney, who encouraged them to file a formal claim against JPM.

141.    Mr. SM did not speak with Mr. McBride about filing a formal claim.

142.    On June 30, 2016, Mr. SM filed for FINRA arbitration (Case No. 16-02330).

143.    Mr. SM sought compensatory damages in the amount of $400,000.

144.    This customer dispute is referenced in the CRD as occurrence number 1900529.

145.    On July 28, 2016, Mr. SM transferred the SM Portfolio away from JPM.

146.    As of July 2016, the value of the SM Portfolio was approximately $2.517 million, which showed a gain from the initial value of approximately $2.45 million. Mr. SM received more than $60,000 in dividends from the Income Fund, which was valued at $757,000. Mr. SM's annuities were valued at approximately $1.5 million. Mr. SM had withdrawn $200,000 from the SM Portfolio.

147.    On August 25, 2016, JPM received notice of Mr. SM's claim and reported it to Mr. McBride's Registration records as a customer dispute, alleging that the "Client alleges suitability and misrepresentation regarding variable annuity, mutual funds and debt-municipal investments. Activity dates 09/2014-09/2014."

148.    On April 11, 2018, to avoid the costs of further litigation and potential business disruption, JPM settled with Mr. SM in the amount of $110,000. The settlement was a fraction of the amount sought and nominal in light of the potential cost of continued arbitration or litigation. JPM denied all claims in the underlying dispute. Mr. McBride did not contribute to the settlement amount, nor did he receive, review, or sign the settlement agreement.

149.    In entering into the settlement, all parties agreed that no negative inference nor admission of liability or wrongdoing should be inferred from the settlement.

### Occurrence Number 1932445

150.    In 2017, Ms. A. P. ("Ms. P") became a client of Mr. McBride with JPM. Mr. McBride inherited Ms. P's existing account when Mr. McBride took over client accounts in another branch of Respondent (the "Fairfax Branch"), in Fairfax, California, which had no

permanent financial advisor. Ms. P was not pleased with the performance of her variable annuity (the "P Annuity").

151.    Mr. McBride learned from the Fairfax Branch manager that Ms. P regularly visited the branch, complained about her account to any employee, and sometimes raised her voice.

152.    Based on Ms. P's conversations with Mr. McBride and her previous financial advisor, as well as personal and financial information forms completed by Ms. P, Mr. McBride and Ms. P ascertained Ms. P's investor profile.

153.    Based on Ms. P's investor profile and investment objectives, Mr. McBride recommended changing the subaccounts of the P Annuity to government bonds, in order to reduce volatility.

154.    On multiple occasions, Mr. McBride explained to Ms. P in detail the terms, risks, costs, fees, features, and benefits of the P Annuity.

155.    On or around August 21, 2014, Ms. P changed the subaccounts of the P Annuity to government bonds, in accordance with Mr. McBride's recommendation. She completed and signed disclosure documents, wherein she affirmed her understanding of the terms, risks, costs, fees, features, and benefits of the change in the subaccounts of the P Annuity.

156.    Between August of 2014 and approximately the mid-2010s, Mr. McBride spoke with Ms. P regularly regarding the performance of Ms. P's portfolio.

157.    In or around the mid-2010s, Mr. McBride was no longer responsible for clients in the Fairfax Branch.

158.    On April 20, 2017, a customer dispute by Ms. P was reported to Mr. McBride's Registration Records, alleging that the "Client alleges misrepresentation regarding variable annuity investment. Activity dates 08/21/2014-08/21/2014."

159.     Ms. P sought compensatory damages in the amount of $7,915.95.

160.     This customer dispute is referenced in the CRD as occurrence number 1932445.

161.     On August 3, 2017, after completing a thorough investigation, JPM denied the claim.

162.     Ms. P did not pursue her claim in arbitration or court.

## FIRST CLAIM FOR RELIEF

### Equitable Relief for Expungement

163.     The foregoing allegations are incorporated as if fully set forth herein.

164.     Both federal and state courts possess broad equitable powers to order expungement of disclosures from a financial advisor's Registration Records, particularly where the disclosure causes ongoing reputational harm and lacks regulatory value. *See, Reinking v. FINRA,* No. A-11-CA-813-SS, 2011 WL 13113323, at *2 (W.D. Tex. Dec. 1, 2011); *Lickiss v. FINRA,* 208 Cal.App.4th 1125 (2012).

165.     Section 27(a) of the Exchange Act explicitly grants federal district courts "exclusive jurisdiction" over "all suits in *equity* and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder." 15 U.S.C. § 78aa(a) (*emphasis added*).

166.     FINRA's own rules recognize the propriety of expungement in circumstances such as this action, as evidenced by: (a) FINRA Rule 2080's provision for expungement of false or erroneous information; and (b) FINRA Rule 8312(g)'s prohibition on publishing misleading information.

167.    Beyond FINRA Rules, the SEC has also recognized the importance of removing inaccurate information from the Registration Records databases. *See,* SEC Release No. 34-48933, 68 Fed. Reg. at 74673.

168.    A request for expungement is a request for an equitable remedy. Although this Court is not bound by FINRA rules, it may consider them in its discretion as guidance for determining whether expungement should be granted.

169.    The exercise of this Court's equitable powers is particularly appropriate here because: (a) Mr. McBride has no adequate remedy at law; (b) the challenged Occurrences cause continual, irreparable harm to his professional reputation; (c) FINRA's publication of the Occurrences serve no legitimate regulatory purpose; and (d) expungement would promote, rather than harm, the public interest.

170.    A statement is defamatory in nature if it paints the advisor in a negative light. A statement does not need to meet the elements of common law defamation to be defamatory in nature.

171.    To be clear, Mr. McBride is not bringing or alleging any claim in tort in this action.

172.    The customers' allegations are false, clearly erroneous, and misleading.

173.    Mr. T's allegations of misrepresentation and unsuitability are false and clearly erroneous. Mr. McBride explained the details of the T Bonds to Mr. T, and Mr. T was provided with written materials pertaining to the investment. Mr. T acknowledged his understanding of said details, and he authorized the investment.

174.    Mr. McBride had a reasonable basis to believe that the T Bonds were suitable investments for Mr. T, based on the reasonable diligence of Mr. McBride and WaMu to ascertain Mr. T's investor profile, as well as on the direct statements of Mr. T himself. Therefore, Mr.

McBride's conduct was in accordance with FINRA's suitability standards, pursuant to FINRA Rule 2111.

175. Mr. G's allegation of unsuitability is false and clearly erroneous. Mr. McBride had a reasonable basis to believe that the G Annuity was suitable for Mr. G, based on the reasonable diligence of Mr. McBride and JPM to ascertain Mr. G's investor profile, as well as on the direct statements of Mr. G himself. Therefore, Mr. McBride's conduct was in accordance with FINRA's suitability standards, pursuant to FINRA Rule 2111.

176. Mr. M's allegation of unsuitability is false and clearly erroneous. Mr. McBride had a reasonable basis to believe that the Putnam Fund was a suitable investment for Mr. M, based on the reasonable diligence of Mr. McBride and JPM to ascertain Mr. M's investor profile, as well as on the direct statements of Mr. M himself. Therefore, Mr. McBride's conduct was in accordance with FINRA's suitability standards, pursuant to FINRA Rule 2111.

177. Mr. SM's allegations of unsuitability and misrepresentation are false and clearly erroneous. Mr. McBride explained all details of the Disputed Investments to Mr. SM and Mr. SM was provided with written materials pertaining to the investments. Mr. SM acknowledged his understanding of said details, and he authorized the investments Mr. McBride had a reasonable basis to believe that the Disputed Investments were suitable investments for Mr. SM, based on the reasonable diligence of Mr. McBride and JPM to ascertain Mr. SM's investor profile, as well as on the direct statements of Mr. SM himself. Therefore, Mr. McBride's conduct was in accordance with FINRA's suitability standards, pursuant to FINRA Rule 2111.

178. Ms. P's allegation of misrepresentation is false and clearly erroneous. Mr. McBride explained the details of the P Annuity to Ms. P, as well as the details of the reallocation of the

annuity. Ms. P acknowledged her understanding of said details, and she authorized the re-allocation of the annuity.

179.    The Occurrences are defamatory in nature because they paint Mr. McBride in a negative light. They imply that he is not fit for his career, and he has been subjected to extreme scrutiny in his field because of the Occurrences. Importantly, the Occurrences are public, permanent (unless expunged), and the harm it causes is perpetual.

180.    The Occurrences mislead the public, employers, and regulators by improperly implying professional misconduct on the part of Mr. McBride in contradiction to the evidence.

181.    FINRA's continued publication of the Occurrences does not benefit the public, nor does it provide meaningful information for employers or regulators. If there was even a minimal benefit to the public or regulators, it is substantially outweighed by the harm to Mr. McBride's personal and professional reputation.

182.    Moreover, Mr. McBride is suffering real, ongoing, and continuous harm with the Occurrences' continued publication as it causes compounding injury over time and each potential client or employer who views the disclosure represents a new instance of harm that cannot be quantified or compensated through monetary damages.

183.    The continued publication of the Occurrences does not offer any benefit or regulatory value to the investing public, nor does FINRA have an interest in publishing false and misleading information to its databases.

184.    Even if there is a minimal benefit to the public or regulators in the continued publication of the Occurrences, such benefit is substantially outweighed by the past, current, and potential for future harm to Mr. McBride.

185.    The balance of equities strongly favors expungement because: (a) FINRA faces minimal burden in removing the disclosure, as it requires only administrative action; (b) Mr. McBride faces ongoing, irreparable harm to his professional reputation; (c) the public interest is served by maintaining accurate registration records; and (d) no legitimate regulatory purpose is served by maintaining false or misleading information.

186.    Equity demands the expungement of the Occurrences, as their complete removal from Mr. McBride's Registration Records is the only remedy that can prevent continuing harm to his reputation and business interests.

187.    This Court's equitable powers provide the appropriate mechanism to ensure the accuracy and fairness of public registration records while protecting legitimate business interests.

**SECOND CLAIM FOR RELIEF**

**Declaratory Judgment for Expungement**

**(28 U.S.C. §2201)**

188.    The foregoing allegations are incorporated as if fully set forth herein.

189.    Pursuant to 28 U.S.C. §2201, this Court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought...[and] such declaration shall have the force and effect of a final judgment or decree[.]"

190.    Declaratory relief requires a determination of (1) an actual, substantial controversy, (2) involving an interested party, (3) that warrants the immediate issuance of a declaratory judgment. *Glenn v. Thomas Fortune Fay*, 222 F.Supp.3D 31, 35 (D.C.Cir. 2016).

191.    While there are "no dispositive factors" the D.C. Circuit has listed several relevant considerations when determining whether or not to exercise the Court's jurisdiction over declaratory actions: (1) whether the declaratory judgment would finally settle the controversy

between the parties, (2) whether other remedies are available or other proceedings pending, (3) the convenience of the parties, (4) the equity of the conduct of the declaratory judgement plaintiff, (5) prevention of procedural fencing, (6) the state of the record, (7) degree of adverseness between the parties, and (8) the public importance of the question to be decided. *Swish Marketing, Inc. v. F.T.C.*, 669 F.Supp.2d 72, 76-77 (D.C.Cir. 2009); *Printing Packaging & Prod. Workers Union of N. Am. v. Int'l Bhd. of Teamsters*, 2024 WL 3835353, at *9 (D.C.Cir. 2024) ("In this Circuit, 'two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" (*quoting Glenn*, 222 F. Supp. 3d at 36.)).

192.    As outlined above, Mr. McBride is entitled to expungement of the Occurrences from his Registration Records under equitable theories of relief, under FINRA rules, or both.

193.    The parties to this case, Mr. McBride and FINRA, are two interested parties to the expungement: Mr. McBride as the individual whose Registration Records would be affected by an expungement and FINRA as the owner and operator of the CRD and BrokerCheck systems from which the Occurrences are sought to be expunged.

194.    The publication of the Occurrences on Mr. McBride's Registration Records is causing, and will continue to cause, substantial, irreparable harm to Mr. McBride by infringing on his privacy rights, inhibiting his ability to seek and engage in advantageous business relationships, and injuring his personal and professional reputation. Every moment that the Occurrences are not expunged, more members of the public, and potential and current clients and employers are able to view the Occurrences, warranting the immediate issuance of a declaratory judgment.

195.    The only remedy to the harm these Occurrences causes to Mr. McBride is expungement.

196.    Expungement would settle the controversy between the parties.

197.    There is no other pending proceeding regarding the matters at issue in this case.

198.    Removing the Occurrences from Mr. McBride's Registration Records will not cause any harm to FINRA as the management of Registration Records systems is part of its fundamental responsibilities.[13] If expungement is granted, FINRA is able to remove the Occurrences from Mr. McBride's Registration Records with just a few clicks of a keyboard from their office.

199.    Removing the Occurrences from Mr. McBride's Registration Records will further the public interest because the public has a legitimate interest in access to accurate public records and the removal of the Occurrences will not adversely affect the public, as the publication of false and misleading information about registered representatives cannot accomplish the investor protection that the Registration Records systems purport to provide.

200.    Additionally, a declaration of expungement will "clarify the legal relations" between Mr. McBride and FINRA and afford relief from the controversy giving rise to this proceeding as it will facilitate the removal of the Occurrence.

201.    Mr. McBride therefore requests a declaratory judgment, in accordance with 28 U.S.C. §2201, that the Occurrences should be expunged from his Registration Records pursuant to this Court's inherent equitable power and/or pursuant to FINRA rules.

### THIRD CLAIM FOR RELIEF

### Permanent Injunction

---

[13] https://www.finra.org/about/what-we-do.

202.    The foregoing allegations are incorporated as if fully set forth herein.

203.    "A party seeking a permanent injunction must show: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Ramirez v. U.S. Immigr. & Customs Enforcement*, 568 F.Supp.3d 10, 21 (D.D.C. 2021) (*quoting Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)); *Printing Packaging*, at *9.

204.    As detailed above, the publication of the Occurrences on Mr. McBride's Registration Records is causing, and will continue to cause, substantial, irreparable harm to Mr. McBride by infringing on his privacy rights, inhibiting his ability to seek and engage in advantageous business relationships, and injuring his personal and professional reputation.

205.    There are no other remedies at law available to Mr. McBride, including monetary damages, that would correct this harm.

206.    Removing the Occurrences from Mr. McBride's Registration Records will not cause any harm to FINRA as the management of Registration Records systems is part of its fundamental responsibilities and an equitable remedy is warranted.

207.    Removing the Occurrences from Mr. McBride's Registration Records will not disserve the public. In fact, removing the Occurrences from Mr. McBride's Registration Records will further the public interest because the public has a legitimate interest in access to accurate public records and removal of the Occurrences will not adversely affect the public, as the publication of false and misleading information about registered representatives cannot accomplish the investor protection that the Registration Records systems purport to provide.

208.    Mr. McBride seeks to permanently enjoin FINRA from continuing to publish any and all references to the Occurrences on Mr. McBride's Registration Records.

## RELIEF REQUESTED

**WHEREFORE**, Mr. McBride prays to this Court for entry of judgment and relief as follows:

A. Entry of judgment in favor of Mr. McBride declaring his right to expungement of the Occurrences from his Registration Records pursuant to the Court's equitable power and/or pursuant to FINRA rules;

B. Entry of judgment and/or an Order directing FINRA to expunge the Occurrences from Mr. McBride's Registration Records and remove all other references to the Occurrences from Mr. McBride's Registration Records;

C. An Order enjoining FINRA from continuing to publish any and all references to the Occurrences; and

D. Any and all further relief as this Court deems just and proper.


Dated: April 1, 2025                         KUTAK ROCK LLP

                                             /s/ *Craig B. Young* (D.C. Bar 279788)
                                             1133 Connecticut Avenue, NW, Suite 1200
                                             Washington, D.C. 20036
                                             (202) 828-2328
                                             craig.young@kutakrock.com


                                             **HLBS LAW**

                                             */s/William R. Bean* (pro hac vice pending)
                                             William R. Bean, Esq.
                                             HLBS Law
                                             390 Interlocken Crescent, Suite 350
                                             Broomfield, CO 80021
                                             (603) 696-4890
                                             William.bean@hlbslaw.com